# EXHIBIT A

## DEMAND FOR ARBITRATION
## AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL ARBITRATION RULES

Hy Cite Corporation
340 Coyier Lane
Madison, Wisconsin 53713

Hy Cite Corporation
333 Holtzman Road
Madison, Wisconsin 53713

The named Claimant, Steven Pollack, a party to an arbitration agreement contained in a written Royal Prestige Distributorship Agreement (the "Agreement") entered into between Hy Cite Corporation ("Hy Cite") and Steven Pollack, providing for arbitration before the American Arbitration Association, hereby demands arbitration thereunder.

**This is not a dispute between a business and a consumer.**

**The nature of the dispute:**

In the Agreement, which incorporates by reference the Hy Cite distributor manual, including the benefits contained therein, Hy Cite agreed to pay Claimant commissions, bonuses and marketing incentives for the sale and distribution of Hy Cite products, including, without limitation, dishware and cookware. Additionally, having achieved the Hy Cite title of "Master," Claimant was entitled to said commissions, bonuses, marketing incentives and other benefits, including, without limitation, commissions for referrals to other distributors, for his entire lifetime. To be sure, part of the incentive and reward to become a Master was in reliance on irrevocable lifetime benefits. Lifetime benefits of a Master could not be terminated for any reason whatsoever. Notwithstanding the foregoing, and independent of his claims as a Master, Claimant was wrongfully terminated as a "Distributor."

As his first claim for relief, Claimant alleges that, in violation of the Agreement, incorporating by reference the Hy Cite distributor manual, Hy Cite improperly terminated Claimant to deprive Claimant of the lifetime benefits of a Master and for his current benefits as a Distributor. Further, Claimant worked to become a Master in reliance upon Hy Cite's promise of lifetime reward. In addition to the express terms of the Agreement, Hy Cite breached the covenant of good faith and fair dealings in the Agreement.

As his second claim for relief, claimant alleges that Hy Cite failed to pay Claimant the correct territory "spin-out" adjustments due a Master, paying him instead a smaller percentage for certain Distributors in his territory.

As his third claim for relief, Claimant alleges that, under the Agreement, Hy Cite was required to give Pollack no less than 30 and as much as 60 days notice of termination. In violation of the Agreement, Hy Cite attempted to terminate Pollack effective immediately, which was improper.

As for his fourth claim for relief, Claimant alleges that Hy Cite improperly deducted $5,000 from Claimant's September, 2011 commission check.

<u>The Claim or Relief Sought</u>

a) On the First Claim for Relief, Claimant seeks the approximate sum of $15,000 per month in commissions and benefits for his entire lifetime, as adjusted by territory sales; a declaration reinstating Claimant as a Distributor; and an award for all sums owed for commissions and benefits past due and owing;

b) On the Second Claim for Relief, Claimant seeks the approximate sum of $225,000;

c) On the Third Claim for Relief, Claimant seeks the approximate sum of $25,000;

d) On the Fourth Claim for Relief, Claimant seeks the sum of $5,000; and

e)     Attorneys' fees, interest, arbitration fees, and expenses.

<u>Types of Business</u>

| | |
|---|---|
| Claimant | Master Territorial Distributor of products sold by Respondent |
| Respondent | Seller of dishware and cookware and related products |

**This dispute does not arise out of an employment relationship, but it does relate to commissions and other benefits due under a service agreement.**

<u>Hearing Locale Requested</u>

You are hereby notified that copies of the arbitration agreement and this demand are being filed with the American Arbitration Association at its New York Regional Office with a request that it commence administration of the arbitration in New York. Under the Rules, you may file an answering statement within fifteen (15) days after notice from the American Arbitration Association.

PLEASE TAKE FURTHER NOTICE THAT UNLESS YOU APPLY TO STAY ARBITRATION WITHIN TWENTY (20) DAYS AFTER SERVICE OF THE DEMAND YOU SHALL BE PRECLUDED FROM OBJECTING THAT A VALID AGREEMENT WAS NOT MADE OR HAS NOT BEEN COMPLIED WITH AND FROM ASSERTING THE BAR OF ANY STATUTE OF LIMITATIONS.

Dated: January 12, 2012

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.

By: _____
David Blumenthal, Esq.
875 Third Avenue – 9th Floor
New York, New York 10022
Telephone: (212) 603-6300
Fax: (212) 956-2164



# The Royal Prestige Distributorship Agreement

ROYAL PRESTIGE DISTRIBUTORSHIP AGREEMENT

AGREEMENT, made this _____ day of _____, 19___, by and between Hy Cite Corporation ("Hy Cite"), a Wisconsin corporation, and _____ ("Distributor"), a _____, d/b/a _____ (SS# _____/or Federal Taxpayer I.D.# _____), with principal place of business at _____, _____
                               (Street Address)           (City)

_____ _____
(State)             (Zip Code)

### Preamble

Hy Cite has secured certain exclusive and other distribution rights for Royal Prestige brand china, cookware, crystal, cutlery and related items (the merchandise), and Distributor wishes to distribute that merchandise to consumers. Distributor further desires to receive services to assist it in establishing and promoting its independent business, including a source of financing of sales, a supply of promotional material and consultation, and financial recognition for assisting in the expansion of the distribution of the merchandise. In consideration for the mutual covenants in this Agreement, and other good and valuable consideration, the parties agree as follows:

### I. GENERAL AGREEMENTS

**Appointment of Distributor**    1.    Hy Cite (the Company) hereby appoints Distributor as an independent distributor to sell the merchandise. Distributor accepts the appointment and agrees to act as an independent distributor of the merchandise. Except as otherwise agreed in writing by Hy Cite, Distributor shall sell only Hy Cite merchandise and shall not sell any goods of similar nature. Distributor agrees not to seek to contract for personal services with any individual who has a contractual relationship with another Royal Prestige distributor.

**Sale of Merchandise**    2.    During the term of the Agreement, the Company will sell to Distributor such merchandise as Distributor wishes to buy from the Company and which the Company wishes to sell to Distributor.

**Financing Through the Company**    3.    All sales orders and related open end and/or closed end agreements (credit agreements) which Distributor assigns for financing shall be assigned to the Company according to the general terms of assignment contained in such agreements or as specified as a part of this Agreement, or as otherwise required by the Company. Distributor may decide not to assign all sales orders or credit agreements, but shall not, in any event, assign to the Company less than 50% of all financed business.

**Independent Contractor**    4.    Distributor is, and is intended to be, engaged in its own and entirely separate business. Distributor shall not have any right, power or authority to bind the Company, transact any business in the name of the Company or make any promises or representations on behalf of the Company. Distributor shall represent itself only as an independent contractor appointed as a distributor for purposes of selling the merchandise. Except as otherwise provided herein, the Company retains no control over Distributor with respect to its business organization, operations, or the

manner, means or methods by which it conducts its business or performs its obligations hereunder. It is expressly understood and agreed that the financial success of Distributor's business is wholly dependent upon the managerial effort, time and skill expended by Distributor. Distributor may sell its business without need of any approval of the Company; provided that any assignment of this Agreement is subject to the restrictions of section 23(a), below.

All costs and expenses incurred by Distributor in the performance of this Agreement shall be the sole and entire responsibility of Distributor. This includes but is not limited to the Distributor's responsibility for federal and state tax purposes (such as corporate or self-employment tax, and all FICA, income tax withholding, unemployment compensation and the like for Distributor's employees, if any).

## II. CONDITIONS OF SALE OF MERCHANDISE

Prices and Terms    5.    Prices and terms applying to the purchase of merchandise shall be those established by the Company and published in price lists issued by the Company. Distributor acknowledges that the level of prices may depend in part upon the volume of sales attributable to Distributor (either through direct sales to Distributor or to others in Distributor's network, as discussed below). The Company shall issue price lists periodically and make them available to Distributor, along with the terms of any volume discounts (which will be established in the Distributor's Manual).

The Company takes the responsibility to deliver the merchandise to the consumer in proper condition. All sales will be drop-shipped to the consumer's address, and the costs of shipment (described in more detail in the Distributor's Manual) are borne by the Distributor. If merchandise is not shipped by the Company within thirty (30) days of their receipt of the order, and such delay is due to factors within the control of the Company, then the Company will bear the costs caused by a cancellation of the order.

Warranty    6.    The Company extends the following express warranty to Distributor: All merchandise shall be free of defects in material and workmanship for the life of the merchandise which shall be deemed to be fifty (50) years. The foregoing express warranty extends to breakage in shipment. THE COMPANY MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY WARRANTY OF FITNESS FOR PARTICULAR PURPOSE OR OF SATISFACTION OF THE CUSTOMER.

Remedy    7.    The exclusive remedy of the Distributor shall be repair or replacement of the merchandise, at the Company's option. The cost of replacement merchandise shall be borne by the Company, in the event of a breach of warranty. The current terms of the Company's Service Policy, described in the Distributor's Manual, are incorporated herein as if set forth in full. The parties agree that under the commercial circumstances herein, this limitation of remedies is reasonable.

## III. TERMS OF FINANCING

Terms of    8.    The parties acknowledge that the form of assignment is
Assignment        important to the Company in order to form a proper foundation for the financing, and in order to permit the Company's lender(s) to properly secure credit granted to the Company. The Company shall therefore specify the terms of assignment from time to time, in standard terms applicable to all distributors. The initial standard general term of assignment, including requirements for repurchase by the Distributor, are contained in

2

Appendix A to this Agreement, made a part hereof as if fully set forth in this place.

<u>Distributor's Proceeds of Assignments</u>  9. (a) Upon acceptance of open or closed end agreements (credit agreements) for financing, the Company will compute the amount due Distributor and transmit it to Distributor with a report showing the basis for the transmittal. The specific procedure for making such computations and handling transmittals shall be specified in the then current Distributor's Manual which may be changed from time to time by the Company.

<u>Contingent Reserve</u>  (b) The Company shall establish a Contingent Reserve fund as security for Distributor's performance by deducting from the proceeds of assignment a percentage of the unpaid balance on each purchase made under the credit agreements. The percentage of the unpaid balance generally applicable from time to time shall be established by the Company and be included in the then current Distributor's Manual. The percentage can be changed upon thirty (30) days' written notice from the Company, in the Company's sole discretion. The Company shall apply to the credit of the Company so much of the funds in the Contingent Reserve as are necessary to satisfy any loss sustained as the result of Distributor's failure to perform under this Agreement. When all credit agreements have been paid off and all obligations under this Agreement discharged, any balance in the fund shall be returned to Distributor. Adjustments shall be made to the Contingent Reserve fund as described in the Distributor's Manual.

<u>Charges</u>  (c) The Company may impose reasonable charges upon the processing of assignments, including costs of credit investigation. Such charges shall be specified in the Distributor's Manual or another publication furnished to all distributors by the Company. The Company may in its sole discretion change the level of said charges, upon no less than thirty (30) days' written notice to Distributor. In the event the Distributor is no longer active, then the costs of outside collection efforts and handling charges also will be assessed to the Distributor where applicable.

<u>Repurchase/Reassignment</u>  (d) Under the specific requirements of Appendix A to this Agreement, Distributor will repurchase closed end credit agreements, or pay the outstanding balance and accept reassignment of open end credit agreements, upon default in payment, or other circumstances described in Appendix A.

<u>Special Covenants as to Financing</u>  10. (a) Distributor shall use forms for sales orders, credit applications and credit agreements approved by the Company.

(b) Distributor warrants and guarantees that all sales orders and credit agreements are valid, and free from liens, setoffs, counterclaims or credits whatsoever.

(c) The Company shall provide Distributor with a list of credit agreements that become two (2) payments delinquent, and other delinquent credit agreements on request.

(d) Distributor shall provide and maintain adequate service on the merchandise and shall provide service to customers as requested by the Company.

(e) If Distributor requests, the Company will collect and remit sales taxes for a fee established in the Distributor's Manual. If Distributor collects and remits

3

sales taxes, a copy of the registration shall be sent to the Company and Distributor shall provide a proof of payment upon request by the Company.

(f) Except for the down payment or as otherwise authorized in writing, Distributor shall not solicit or collect any payments from consumers and shall not accept or endorse any checks, drafts, money orders or other forms of payment from consumers. Distributor shall direct consumers to make such payments directly to the Company, and shall forward all communications from consumers to the Company. The Company shall be authorized to endorse Distributor's name on any checks, drafts, money orders or other forms of payment coming into the Company's possession in connection with assignments to the Company, and Distributor hereby designates the Company its attorney-in-fact for, and only for, such purpose.

## IV. THE ROYAL PRESTIGE MARKETING PROGRAM

**Financial Incentives to Distributors Under the Program**

11. Under the Royal Prestige Marketing Program (the Program), Distributor will be entitled to receive the benefit of certain bonuses, discounts, rebates and reduced prices. The Company will develop and maintain the following features as a continuing part of the Program.

**Price Levels**

(a) The aggregate amount of purchases within the Distributor's Network shall determine the Distributor's qualification for reduced merchandise prices. The Company will maintain merchandise price lists which reflect lower prices to Distributors as aggregate network sales increase.

**Discount Rates**

(b) Utilizing the same aggregate network sales figures as applied in the preceding subparagraph (a), the Company will establish reduced discount rates in its financing procedures as aggregate network sales increase.

**Sponsoring/Recruiting Bonus**

(c) For recruiting or sponsoring a distributor, Distributor shall be paid a bonus, computed as a percentage of the purchases of merchandise by such other distributor. The percentage applied may depend upon the amount of merchandise purchased by the other distributor. This bonus will be paid to the original recruiting or sponsoring Distributor for an indefinite term, to continue as long as the Company or its successors or assigns continue in the business which is the subject of this Agreement.

**Sponsoring Finance Charge Rebate**

(d) For sponsoring a distributor, Distributor shall be paid a percentage of the retail finance business done by the sponsored distributor.

**Quarterly Purchase Volume Discount**

(e) For providing service to another distributor, Distributor shall be paid a percentage of the purchases computed as a variable percentage of the quarterly purchases by the Distributor (i.e. direct purchases) and quarterly purchases by other distributors which are serviced.

**Servicing Finance Charge Rebate**

(f) For servicing another distributor, Distributor shall be paid a percentage of the retail finance business done by that Distributor.

4

The basic principles governing the Program actually set forth in this Agreement (i.e. not to include matters incorporated herein by reference) cannot be changed or amended except through a written amendment to this Distributorship Agreement. Those portions of the Distributor's Manual which are specifically identified as the Royal Prestige Marketing Program, as revised from time to time, are hereby incorporated by reference as if fully set forth in this Agreement. The terms of the Program contained in the Distributor's Manual may be changed by the Company in its discretion except as limited by the following restrictions:

(a) The percentages set forth in the Manual as of January 1, 1986, used in computing the discount rate differential between distributor levels (sec. 11(b)), the percentage of purchases to be paid under the sponsoring/recruiting bonus (sec. 11(c)), the percentage of total balances due from customers under the sponsoring finance charge rebate (sec. 11(d)), the percentage discount rate earned under the quarterly purchase volume discount (sec. 11(e)), and the percentage of retail financed balances to be paid under the servicing finance charge rebate (sec. 11(f)) shall not be changed without the approval of the Royal Prestige Advisory Board, which approval shall not be unreasonably withheld. Notwithstanding the foregoing, if interest rates increase to a point which, in the Advisory Board's discretion, requires reduction or discontinuance of the higher discount level for Distributors of Levels II and III, then the discounts described in sections 11(d) and (e), above, will be reduced or discontinued temporarily to accommodate such market conditions.

(b) The amounts of total calendar year purchases needed to qualify for various price and finance charge levels (i.e. Levels I, II and III) (secs. 11(a) and (b)), the amount of quarterly purchases needed to receive particular discount rates under the quarterly purchase volume discount (sec. 11(e)), or any similar levels of purchases, financed balances or the like that might be utilized in the Program, may be adjusted at the discretion of the Company, but the percentage change of any such adjustments shall not exceed the percentage change of the cumulative price increase of the merchandise for the same period. The percentage increase specified in the preceding sentence may only be exceeded with the approval of the Royal Prestige Advisory Board, which approval shall not be unreasonably withheld.

<u>Dispute Resolution</u>   13.   Disputes which arise between distributors as to the
<u>Within the Program</u>          entitlement of various distributors to the benefits of the
                                 Program, and which do not involve a dispute between any distributors and the Company, shall be resolved by the Royal Prestige Advisory Board, described in Part VI of this Agreement. Any disputes regarding operation of the Program, and affecting the rights of the Company, and specifically confined to the interpretation of this Part IV of this Agreement and any portions of the Distributor's Manual incorporated herein and relevant to such dispute, shall be submitted for binding arbitration under the usual rules and procedures of the American Arbitration Association and Chapter 788 of the Wisconsin Statutes as amended or renumbered. Either Distributor or the Company may initiate a demand for arbitration. Any arbitration pursuant to such demand shall be heard by the arbitrator within 20 days after selection of the arbitrator. The arbitrator shall be selected by mutual agreement of the Company and Distributor. In the event the parties cannot agree to the selection of an arbitrator, the arbitrator will be chosen by the Chief Judge of the Circuit Court of Dane County, Wisconsin. There shall be one individual to serve as arbitrator. Any decision or determination pursuant to the arbitration may be entered as a judgment in any court having jurisdiction.

## V. THE COMPETITIVE ARENA

Information  14. (a) The Company shall maintain data processing capabilities which enable it to accumulate aggregate sales figures for all distributors selling the merchandise pursuant to Agreements with the Company. The specific rules for operating the Competitive Arena shall be determined by the Royal Prestige Advisory Board.

Recognition  (b) The Company shall maintain a series of national meetings at which distributors in the Competitive Arena will be recognized and will receive awards based on their performance. The Royal Prestige Advisory Board will determine the dates and locations for such meetings, and will establish the format and content of the recognition programs.

In establishing the rules for operation of the Competitive Arena under this paragraph (b), or under paragraph (a), the Royal Prestige Advisory Board will not impose additional costs upon the Company which are materially in excess of those undertaken by the Company with respect to the operation of the Competitive Arena as of January 1986.

## VI. THE ROYAL PRESTIGE ADVISORY BOARD

The Royal Prestige Advisory Board  15. The Royal Prestige Advisory Board shall consist of representatives of the five (5) Distributors with highest purchases for the previous year, two (2) Distributors with the highest purchases for their territory for the previous year and two (2) representatives of the Company. In the event there is overlap among the two (2) categories of Distributor representatives, the number three (#3) territory will be the next chosen and, if necessary, next the number six (#6) Distributor, and so on as necessary, alternating, until the seven (7) seats are filled. The Advisory Board shall establish its own rules and procedures. The Advisory Board shall resolve disputes between or among distributors, but shall not have any authority to interpret this Agreement, or resolve disputes which involve the Company. The Distributor agrees to be bound by decisions of the Advisory Board within its above-stated authority.

The Advisory Board shall also have authority to establish the rules for the Competitive Arena.

The Advisory Board shall meet no less frequently than annually at such time as established by the Advisory Board, which shall generally be in conjunction with a general or special meeting of distributors.

## VII. GENERAL COVENANTS

Term; Automatic Renewal  16. Unless earlier terminated as hereafter provided, this Agreement shall continue for a period of one (1) year from the date hereof. Unless notice of termination is given by any party no less than sixty (60) days before the termination date of this Agreement, it shall continue for additional one (1) year terms on the same terms and conditions.

Termination  17. This Agreement may be terminated by any party with or without cause on sixty (60) days' written notice. In the event Distributor defaults in the performance or observance of any of the terms or conditions of this Agreement, or in the event of the cessation of business, a continuation of bankruptcy or other insolvency proceedings by or with respect to

6

Distributor which continues without dismissal for more than thirty (30) days, the Company may terminate this Agreement upon ten (10) days' written notice to Distributor.

Trademarks;
Service Marks;
Logos; Commercial
Symbols

18. Distributor recognizes and acknowledges that the Company is the exclusive owner of the various trade names, trademarks, service marks, designs, logos, slogans and commercial symbols which they now use and may hereafter employ in connection with the merchandise, hereinafter referred to as "Marks;" that large sums of money have been expended to popularize the Marks; and that the Marks represent valuable goodwill distinctive to the business and reputation of the Company. Therefore, Distributor, as a means of maintaining and protecting the integrity, continuity and goodwill associated with the Marks, and the corresponding uniform high quality standard associated with the merchandise, agrees that: (a) it will not use, directly or indirectly, in whole or in part, the Marks as a part of any trade, corporate or business name without the prior written consent of the Company; (b) prior to using any of the Marks in any way incident to, or in connection with, Distributor's promotion, distribution or sale of the merchandise, it will submit the proposed use to, and obtain the written consent from, the Company; (c) if in the judgment of the Company, the acts or omissions of Distributor infringe upon or demean the goodwill, standards of quality, or business standing related to the Marks or the merchandise, then Distributor, upon receiving written notice from the Company, will immediately modify or discontinue, as the case may be, its use of the Marks in the manner prescribed by the Company in the written notice; (d) any and all improvements and developments in and to the Marks by Distributor shall become the sole and exclusive property of the Company, and the Company shall have the sole and exclusive right to register or otherwise protect such improvements or developments in its name; and (e) upon the termination of this Agreement, it will immediately discontinue any and all approved uses of the Marks, and shall not thereafter use any mark in connection with any business in which Distributor may thereafter be engaged, which, in the sole judgment of the Company, so nearly resembles any of the Marks, or part thereof, then owned or employed by the Company as may be likely to lead to confusion or uncertainty on the part of the public.

Laws and
Regulations

19. Distributor shall be solely responsible for determining the applicability of, and compliance with, any and all present and future federal, state and local laws, orders, codes, regulations and ordinances which may be applicable to Distributor or Distributor's business.

Consent to Use
of Name and
Likeness

20. Distributor hereby irrevocably consents to the use of Distributor's name, portrait, picture or likeness for advertising purposes, purposes of trade, or any other purpose reasonably connected to the conduct of the Company's business.

If Distributor is a corporation or partnership, Distributor agrees that it will obtain such consent from all employees, partners, agents or representatives of Distributor, and will indemnify the Company against any claims against the Company for its use of name, portrait, picture or likeness of any such individuals.

Hold Harmless

21. Distributor shall hold the Company, its officers, agents and employees harmless from and against all penalties, claims, demands, causes of action, suits, judgments, costs and expenses, including actual attorney's fees, of whatsoever nature, except those resulting from the breach, default or negligence of the Company, that may be made against the Company from and after the commencement of this Agreement, arising from or growing out of:

7

(a) the breach of any warranty or representation by Distributor hereunder; (b) the failure of Distributor to keep, perform and observe each and every one of the terms and conditions herein contained on Distributor's part to be kept, performed and observed; (c) the tortious or negligent conduct, act or omission of Distributor; (d) the failure of Distributor to comply with and observe present and future federal, state and local laws, orders, codes, regulations and ordinances which may be applicable to Distributor's business; or (e) the activities performed by Distributor incident to and under this Agreement.

<u>Distributor's Warranties and Representations</u>  22. Distributor warrants and represents: (a) that the execution of this Agreement and the discharge of Distributor's obligations hereunder will not breach or conflict with any other contract, agreement or understanding between Distributor and any other party for any reason whatsoever; (b) that it has adequate skill, capability and expertise relative to Distributor's business and the nature and character of the merchandise offered by the Company to attract, establish, foster, serve and maintain its customers for the purpose of selling the merchandise.

<u>Miscellaneous</u>  23. (a) <u>Assignment</u>. The appointment of Distributor hereunder is personal and does not include the right, power or authority of Distributor to appoint other distributors or licensees without the prior written consent of the Company. This Agreement is personal and shall not, nor shall any interest herein, be assignable as to the interest of Distributor, whether by contract, operation of law or otherwise, without the prior written consent of the Company. A consent by the Company to one assignment shall not be deemed a consent to any subsequent assignment.

(b) <u>Covenant to Further Assurances</u>. Distributor, upon reasonable request from the Company, shall execute and deliver such documents and take such action as may be reasonable in order to carry out fully the intended purpose and object of this Agreement.

(c) <u>Notices</u>. All communications required or permitted to be given or made hereunder shall be in writing and shall be deemed to have been properly given if sent by certified or registered mail, postage prepaid, addressed as follows:

    If to the Company: Hy Cite Corporation
    340 Coyier Lane
    Madison, WI   53713

and if to Distributor at the address shown at the top of this Agreement. The Company or Distributor may change its address by giving notice to the other in the manner aforesaid.

(d) <u>Entire Agreement</u>. This Agreement (including the material incorporated herein by reference) contains the entire agreement between the Company and Distributor with respect to Distributor's purchase and distribution of the merchandise. There are no other terms, conditions, promises, understandings, statements or representations, express or implied, covering the subject matter hereof, and this Agreement may not be changed, amended, modified, released or discharged, in whole or in part, except by an instrument in writing, referred to as an amendment to this Agreement, and signed by all parties. This Agreement cancels and supersedes all previous agreements and understandings, if any, written or verbal, between the Company and Distributor relating to the subject matter hereof.

8

(e) <u>Binding Effect</u>. This Agreement, and all of the terms and conditions hereof, shall bind and inure to the benefit of the Company and Distributor and their respective successors, transferees and assigns.

(f) <u>Construction</u>. The headings to the paragraphs hereof have been inserted for convenience of reference only and shall not modify or restrict any provisions hereof, or be used to construe any of such provisions. This Agreement shall be governed, interpreted, construed and enforced according to the laws of the State of Wisconsin.

(g) <u>Waiver</u>. The failure of the Company or Distributor at any time to require performance by the other party of any term or condition of this Agreement shall not affect the full right to require such performance at any subsequent time. Nor shall the waiver by either party of a breach of a term or condition constitute waiver of any succeeding breach of a term or condition, or waiver of the term or condition itself.

(h) <u>Severability</u>. If any term or condition of this Agreement is held to be invalid, or unenforceable, by reason of any statute, regulation, rule of law or public policy, all other terms and conditions of this Agreement shall nevertheless remain in full force and effect, as if this Agreement had been executed with the invalid or unenforceable portion thereof eliminated, and no term or condition shall be deemed dependent on any other term or condition unless so expressed.

(i) <u>Force Majeure</u>. A party shall not be liable for damages or otherwise if any performance required of that party shall be prevented, hindered, or delayed, or made impracticable by any cause beyond the effective control of the party, including, but not limited to: acts of God or the elements; explosion, fire, storm or flood; declared or undeclared war, interference of civil or military authority, rationing, or civil disturbances; strikes, lockouts, work stoppages or the like; failure of carriers to furnish facilities; failure of or interference with supply from the Company's present and future sources of supply which the Company cannot, exercising its best and most diligent effort, timely replace; or any delay or failure caused by requisition, order, embargo, or other law or regulation, whether valid or invalid, of any governmental agency or tribunal.

IN WITNESS WHEREOF, Hy Cite Corporation and Distributor by their respective duly authorized officers and principals, have executed this Agreement as of the day and year first above written.

Attest:

HY CITE CORPORATION

By_____
Peter O. Johnson, President

_____
Dennis R. Young, Vice President

DISTRIBUTOR:

Attest:

_____

By_____

_____

PERSONAL GUARANTY

The undersigned Guarantor hereby guaranties the performance by Distributor of this Agreement in all respects, and in particular payments under all credit agreements, whether or not Distributor specifically indorsed, assigned or otherwise signed the particular agreements to Hy Cite Corporation.

9

Guarantor waives notice of acceptance, notice of presentment, dishonor protest, notice of demand or default, and any and all other notices to which Distributor or Guarantor might otherwise be entitled.

The Company may deal in any manner with the credit agreements, to modify their terms, grant extensions or renewals, and to effect any release or compromise thereof, to enter into any agreement or forebearance thereof, all without notice to Guarantor. The obligations of Guarantor shall not be released or discharged or in any way affected, nor shall Guarantor have any right of recourse against the Company, by reason of any action the Company may take or omit to take under the foregoing power, unless the Company shall act in bad faith in exercising its rights.

Dated: _____        _____
                                      Guarantor

10

APPENDIX A

TERMS OF ASSIGNMENT

CLOSED END

<u>Standard Form</u>   1.  (a)  Hy Cite Corporation ("the Company") shall specify the terms of assignment of closed end retail installment agreements acceptable to it by providing a form of assignment to be used by Distributor. Such form will appear as a part of the standard forms for such agreements prepared by the Company. Distributor will use such form or a form of assignment substantially similar thereto, in the opinion of the Company's counsel.

<u>Repurchase</u>   (b) Distributor shall repurchase closed end contracts under circumstances specified as applicable to all distributors from time to time. Initially, and unless subsequently changed for all distributors, Distributor shall repurchase closed end agreements ("contracts") under the following circumstances: (i) any contract that is three (3) or more payments past due; (ii) any contract upon which the consumer has returned goods, and a resolution of status cannot be reached between Distributor and the Company within thirty (30) days after return of goods; (iii) the Company receives notice of a complaint, claim or defense of a consumer against Distributor or the Company; (iv) any warranty of Distributor is false or is breached; (v) cessation of business, insolvency, or pendency of bankruptcy proceedings against Distributor (or any of its principals if Distributor is a partnership or corporation) which proceedings have not been dismissed within thirty (30) days of their commencement; or (vi) failure of Distributor to timely repurchase upon demand under any of the preceding subparagraphs.

In the event of termination of the Distributorship Agreement, the Distributor's obligation to accept repurchase hereunder shall survive termination and continue for as long as the Company carries contracts as receivables that were assigned by Distributor. If repurchase of any of these contracts is called for under the terms of this section (b), the Contingent Reserve will be utilized to the extent possible, while still maintaining its required level in proportion to remaining receivables; additional repurchases will be for cash.

All repurchases (except after termination) shall be for cash, and Distributor shall make the repurchase or shall permit the Company to deduct it from transmittals (as opposed to being charged to the Contingent Reserve) during the first fifteen (15) months of this Agreement, whether or not the customer has made payments on the contract. After the first fifteen (15) months of this Agreement, the repurchase can be made out of the Contingent Reserve fund, if adequate, in the event the customer has made payments on the contract, but shall be made by the Distributor and deducted from subsequent transmittals (as opposed to being charged to the Contingent Reserve) if no payments have been made on the contract.

The Company shall be entitled to finance charges based on the Rule of 78's when Distributor shall repurchase a contract upon which the customer has made payments. Distributor shall repurchase a contract before bringing suit thereon.

OPEN END

2.  Hy Cite Corporation ("the Company") agrees to accept assignment by the Distributor of credit plans and sales orders in accordance with the following provisions:

11

Warranties (a) Distributor warrants that (i) the credit plans and/or sales orders (hereafter collectively "the documents") are genuine, and no consumer executing the documents was a minor or incompetent when the documents were executed; (ii) all statements contained in the documents are true; Distributor has no notice of any matters not disclosed to the Company which might impair the credit of the consumers; (iii) the documents and transactions out of which they arose comply with applicable laws and regulations; Distributor has performed or will perform all of its obligations to the consumers; and no consumer has, or has asserted, any claim against Distributor under the documents or any defense, set-off or counterclaim to the consumer's liability under the documents; (iv) Distributor has full authority to assign the documents to the Company and the Company's interest in the documents is not subordinate to any security interest or other encumbrance.

Acceptance by the Company (b) Each assignment is conditional upon acceptance by the Company, and shall not be effective as an assignment until such acceptance is made by the Company's execution of the documents. The Company shall have no duties, liabilities, or obligations to Distributor or the consumer with respect to the documents involved in that transaction.

Authority of the Company (c) Once documents are accepted and the assignment becomes effective, the Company may, without notice and without impairing the Company's rights against Distributor, in the name of Distributor or otherwise, take all actions and legal proceedings deemed advisable by the Company with respect to the documents, including without limitation modifying, extending or compromising any terms or discharging or releasing any person liable. The Company is authorized to endorse the name of Distributor upon any instruments which may come into the Company's possession.

Nonliability of the Company (d) The Company has no duty to enforce any rights of Distributor or to preserve rights under the Agreement against prior parties.

Payment Made to the Company (e) Any payment made by consumers pursuant to a credit plan is the property of the Company. In the event any such payment is sent to Distributor, Distributor shall have no right, interest or title thereto, and shall immediately forward such payments to the Company.

Remedy of the Company (f) In addition to any remedies the Company might have against the consumer involved in any particular transaction, if: (i) the consumer defaults with respect to any obligation in a consumer's credit plan; (ii) a consumer returns all or part of the merchandise subject to a credit plan, and a resolution of status cannot be reached between Distributor and the Company within thirty (30) days after return of goods; (iii) the Company receives notice of a complaint, claim or defense of a consumer against Distributor or the Company; (iv) any warranty of Distributor is false or is breached; (v) cessation of business, insolvency or pendency of bankruptcy proceedings against Distributor (or any of its principals if Distributor is a partnership or corporation) which proceedings have not been dismissed within thirty (30) days of their commencement; or (vi) failure of Distributor to timely assume re-assignment of a credit plan under any of the preceding subparagraphs, then Distributor shall, upon request of the Company, pay the Company in cash the amount of the then outstanding credit balance under the subject credit plan, plus expenses incurred by the Company in endeavoring to collect or enforce the credit plan and the assignment of the plan.

12

In the event of termination of the Distributorship Agreement, the Distributor's obligation to accept reassignment hereunder shall survive termination and continue for as long as the Company carries credit plans as receivables that were assigned by Distributor. If re-assignment of any of these credit plans is called for under the terms of this section (f), the Contingent Reserve will be utilized to the extent possible, while still maintaining its required level in proportion to remaining receivables; additional re-assignments will be for cash.

Distributor agrees to accept an assignment of the credit plan back to Distributor, from the Company, without recourse or warranties whatever, and Distributor indemnifies and agrees to defend and hold the Company harmless from any loss, liability, penalty, claim, damage or expense claimed or incurred by reason of the credit plan or its assignment to the Company.

(g) All assignments back to Distributor in exchange for payment to the Company of the unpaid balance and expenses shall be on the same terms as repurchase of closed-end contracts as specified in section 1, above.

(h) Distributor shall pay the unpaid balance under a credit plan and take back an assignment of the credit plan before bringing suit thereon.

-- End of Appendix A --